**UNITED STATES DISTRICT COURT**

**WESTERN DISTRICT OF WASHINGTON**

**SEATTLE DIVISION**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>DOUVER TORRES BRAGA,<br>JOFF PARADISE, and<br>KELEIONALANI TAYLOR,<br><br>Defendants. | No. 2:22-cv-01563<br><br><br>**COMPLAINT** |

Plaintiff Securities and Exchange Commission (the "SEC") alleges:

**<u>SUMMARY OF THE ACTION</u>**

1.      Douver Torres Braga ("Braga"), Joff Paradise ("Paradise"), and Keleionalani Taylor ("Taylor," collectively "Defendants"), ran or promoted a Ponzi scheme called "Trade Coin Club" that raised at least $295 million from more than 100,000 investors between December 2016 and May 2018.

2.      Trade Coin Club was a fraudulent international offering scheme that collected more than 82,000 bitcoin, worth approximately $295 million at the time, from more than

COMPLAINT
*SEC V. BRAGA ET AL.* (NO. 2:22-CV-01563)
1
**Securities and Exchange Commission**
44 Montgomery Street, Suite 2800
San Francisco, California 94104
(415) 705-2500

1  100,000 worldwide investors, and was marketed as an opportunity to profit from the supposed

2  crypto asset trading activities of Trade Coin Club's alleged crypto asset trading bot.

3      3.      Defendant Braga was the creator and primary beneficiary of the Trade Coin Club

4  fraud, receiving at least 8,396 bitcoin, worth approximately $55 million at the time, from Trade

5  Coin Club's investors.

6      4.      Braga orchestrated the fraud through his control and operation (through

7  programmers he hired) of the Trade Coin Club website, through which investors deposited their

8  bitcoin, and through his distribution and presentation of online marketing materials that made

9  numerous materially false and misleading statements to lure investors to send their bitcoin to

10  Trade Coin Club.  These materials and recorded video presentations by Braga falsely claimed

11  that Trade Coin Club had successfully developed and was earning profits from an automated

12  crypto asset trading program or "bot."  Braga also falsely stated that the trading bot made

13  "millions of microtransactions" every second and had a "stop loss" feature that would assure

14  minimum daily trading profits for investors.

15      5.      Among other evidence, blockchain analysis reveals that, in reality, Trade Coin

16  Club operated in a manner consistent with a Ponzi scheme.  Specifically, Trade Coin Club had

17  no external source of funding for investor withdrawals or redemptions, such as profits from

18  trading.  Instead, investor withdrawals were paid solely with investor deposits.  Blockchain

19  analysis also confirms that at least 8,396 bitcoin, worth $55 million at the time, was transferred

20  from Trade Coin Club investor deposits to addresses controlled by Braga at certain crypto asset

21  platforms.

22      6.      To recruit new investors to join Trade Coin Club, Braga implemented a pyramid

23  scheme-like referral system to reward existing members for recruiting new investors.  The Trade

24  Coin Club "membership packages" were offered and sold by Defendants as investment

25  contracts, and therefore securities, under the federal securities laws.  Defendants offered and sold

26  these securities without registration, and without qualifying for any exemption from registration.

27      7.      Braga recruited and trained others, including "master distributors," to present the

28  marketing materials and repeat the false and misleading statements about the purported trading

COMPLAINT
*SEC V. BRAGA ET AL.* (NO. 2:22-CV-01563)

2

**Securities and Exchange Commission**
44 Montgomery Street, Suite 2800
San Francisco, California 94104
(415) 705-2500

1  bot and guaranteed daily trading profits, including Defendant Joff Paradise.  Paradise, who used

2  the title "Director of the United States" for Trade Coin Club, touted Trade Coin Club

3  extensively, including at events worldwide and in numerous videos posted online that presented

4  the Trade Coin Club marketing materials and repeated the materially false and misleading

5  statements about the purported trading bot and guaranteed daily trading profits.  Paradise

6  received at least 238.97 bitcoin as compensation for promoting Trade Coin Club and soliciting

7  investors, worth approximately $1,410,164 at the time.

8       8.      Paradise, in turn, recruited numerous individuals to invest in and solicit others to

9  invest in Trade Coin Club.  The network Paradise recruited included Defendant Taylor, the

10 largest U.S. promoter of Trade Coin Club who, in turn, solicited a network with thousands of

11 downstream recruits and received approximately 735.54 bitcoin from Trade Coin Club, worth

12 approximately $2,647,413 at the time.  She recorded and posted online videos promoting Trade

13 Coin Club and instructed new investors how to contribute their bitcoin and navigate the online

14 user platform.

15      9.      In early 2018, Trade Coin Club announced that it would discontinue services to

16 U.S. residents.  Shortly thereafter, it ceased providing redemptions to any investors in bitcoin

17 and instead required investors to withdraw assets in "TCoin," a new crypto asset issued by Trade

18 Coin Club, which ultimately became worthless.

19      10.     By summer of 2018, Braga and Paradise ceased promoting Trade Coin Club, and

20 many investors could no longer access any assets in their Trade Coin Club accounts.

21                              **JURISDICTION AND VENUE**

22      11.     The SEC brings this action pursuant to Sections 20(b), 20(d), and 22(a) of the

23 Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77t(b), 77t(d), and 77v(a)] and Sections

24 21(d), 21(e), and 27 of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§

25 78u(d), 78u(e), and 78aa].

26      12.     This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1),

27 and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d)(1), and 77v(a)] and Sections 21(d),

28 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

13.     Defendants, directly or indirectly, made use of the means or instruments or instrumentalities of transportation or communication in interstate commerce, or of the mails, or the facilities of a national securities exchange, in connection with the transactions, acts, practices, and courses of business alleged in this complaint.

14.     Venue is proper in this District pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27(a) of the Exchange Act [15 U.S.C. § 78aa(a)].  Acts, practices, transactions, and courses of business that form the basis for the violations alleged in this complaint occurred within this District.  Defendants Braga, Paradise, and Taylor solicited investors in this District.  During the relevant time period, Taylor also resided in this District. Pursuant to LCR 3(e)(1), assignment to the Seattle Division is appropriate because a substantial part of the relevant conduct occurred in King County.

## DEFENDANTS

15.     **Douver Torres Braga** ("Braga") is 45 years old and resided in Florida during the period of Trade Coin Club's operations but currently resides in Brazil.  Braga created and controlled Trade Coin Club.

16.     **Joff Paradise** ("Paradise") is 60 years old and resided in Nevada during most of the period of Trade Coin Club's operations but currently resides in Panama.  Paradise described himself as the Director of the United States for Trade Coin Club.

17.     **Keleionalani Taylor** ("Taylor") is 42 years old and resides in Mililani, Hawaii. Taylor was the highest compensated U.S.-based promoter of Trade Coin Club and resided in Sammamish, Washington, during most of the period of Trade Coin Club's operations.

## FACTUAL ALLEGATIONS

*Braga Established Trade Coin Club and Recruited Paradise as the Lead Promoter in the United States.*

18.     Braga and Paradise met in or around 2015 through their work promoting a multi-level marketing company that sold skincare and wellness products, which also paid commissions for recruiting new participants.

COMPLAINT
*SEC V. BRAGA ET AL.* (NO. 2:22-CV-01563)
4
**Securities and Exchange Commission**
44 Montgomery Street, Suite 2800
San Francisco, California 94104
(415) 705-2500

19.     In 2016, Braga established Trade Coin Club, a multi-level marketing program that promised profits purportedly made from a proprietary crypto asset trading software or "bot," as well as commissions for recruiting new investors. Braga hired a software development company in Brazil to build the record system that supported Trade Coin Club. The programmers hired by Braga registered and paid for the dedicated, cloud-based server that hosted the Trade Coin Club website, www.tradecoinclub.com.

20.     Investors participated in Trade Coin Club by creating a user account on the website, identifying their sponsor (the person credited with soliciting their investment), and sending bitcoin to a unique public address[1] provided to the user through the website. Investors who created a user account on the Trade Coin Club website could then log in to an area of the website called the "Back Office," where they could view and access details of their account. In the Back Office, Trade Coin Club's promoters (also known as "affiliates" or "distributors") could view the accounts of members they had recruited (which is known as their "downline" or "network"), commissions, and other relevant information.

21.     The Trade Coin Club Back Office displayed what appeared to be up-to-date account information, including purported trading profits. Through the Trade Coin Club Back Office, investors could also request redemptions and specify a public address at which they could receive bitcoin from Trade Coin Club.

22.     Braga made arrangements for an office space and a small staff in Belize, which he identified as Trade Coin Club's headquarters.

23.     Braga shared the office and staff with a company called "Trade by Trade," a newly formed crypto asset trading platform. Braga depicted the two organizations as one combined business and created the false impression that Trade by Trade conducted crypto asset trading activities for Trade Coin Club. Braga also falsely represented to Trade Coin Club investors that Trade by Trade's owner was also Trade Coin Club's owner and president.

---

[1] A public address on the Bitcoin blockchain is a unique identifier that is associated with the amount of bitcoin recorded as having been sent to or received by that address. It is the "public key" half of a pair of keys generated by a cryptographic process and is generally between 24 and 34 alphanumeric characters in length when compressed. The other half of the pair is a "private key" that is then used to "sign" or authorize a transfer of funds from the associated public address to another public address on the Bitcoin blockchain.

24.     In late 2016, Braga recruited Paradise to be a founding member of Trade Coin Club and the Director of Trade Coin Club's U.S. operations.  Braga also presented marketing materials, including a Trade Coin Club slide deck that contained numerous materially false and misleading statements about Trade Coin Club's purported crypto asset trading operations.  Braga trained Paradise and other founding members with territories outside the U.S. on how to present the slide deck and other marketing materials to potential Trade Coin Club investors.

***Braga and Paradise Widely Marketed Trade Coin Club's Purported Crypto Asset Trading Bot and Developed a Large Network to Recruit New Investors***

25.     Beginning in December 2016, Braga pitched Trade Coin Club to contacts in the multi-level marketing industry through online video conferences.  On December 16, 2016, a recorded presentation of Braga announcing the first day of Trade Coin Club's operations was posted to YouTube (the "Kickoff Video").  In the video, Braga explained the Trade Coin Club program for almost an hour while covering the Trade Coin Club slide deck detailing relevant features of the program.

26.     In the December 16, 2016 Kickoff Video, Braga highlighted, among other things, three primary claims that mirrored statements in the Trade Coin Club slide deck and which were important to investors who decided to invest in Trade Coin Club.  Braga stated: (1) that Trade Coin Club operated the first "cryptocurrency" trading "robot" in the world; (2) that the Trade Coin Club bot made "millions of microtransactions" every second; and (3) that the trading software had a "stop loss" feature that guaranteed minimum daily profits from trading.

27.     Speaking in his native language of Portuguese, Braga made the following statements in the Kickoff Video (the English translation is as follows):

> Our system only trades in digital currencies.  Ok?  So it is very clear here, guys.  This is a competitive billion-dollar market, and few people have access to it.  Unfortunately today, few people have access to it.  But through TCC, a software developed by a team specialized in trading, [sic] will provide the opportunity for anyone anywhere in the world to be part of this market and obtain earnings at three different levels of trading.  Guys, three levels of trading. With skill, little skill, or no skill whatsoever.  Sometimes people won't even know what trade is [sic], and they will be able to earn here inside our system.

COMPLAINT
*SEC V. BRAGA ET AL.* (NO. 2:22-CV-01563)
6
**Securities and Exchange Commission**
44 Montgomery Street, Suite 2800
San Francisco, California 94104
(415) 705-2500

When we say robots, this is a system, a software, ok?  Doing everything under the system's control.  …  We have a system that is the first system in the world, the first robot in the world, to operate in cryptocurrency trade ... we are the only robot legitimately trading cryptocurrencies.

Our system makes millions of transactions, microtransactions, every second ... .  That the club has gains every second, every minute, every hour.  It can then have a guarantee that the members will not put at risk all the coins invested.

Do you see something called stop loss down there?  This is not lost, it is stop loss.  Let's correct that.  This stop loss is .35% on the daily trades it guarantees for you.  ...  If you are already a Trader it has a stop loss guarantee of 0.40.  And if you are a "Senior Trader", 0.45 of profit on each trade made daily.  Oh, sorry, not each trade.  At the closing of the trades.  Guys, there are millions of trades.  That compounds.  This compounding, the minimum it will be able to pay you is 0.45.

28.    The Trade Coin Club Back Office contained marketing materials for the program, which included the Trade Coin Club slide deck that Braga presented, translated into twenty languages.  The English version of the slide deck featured the following slide titled, "What Do We Do?", which included false statements about the purported bot:



29.    The Trade Coin Club Back Office also embedded three promotional videos in various languages that had been uploaded to YouTube between December 15, 2016 and June 20,

1    2017.  Braga hired a vendor to create these videos, which featured professional graphics and an

2    unidentified speaker making representations similar to those from the slide deck.

3        30.    Paradise enrolled in Trade Coin Club on December 16, 2016, the day Braga's

4    Kickoff Video was posted online.  In the weeks following the Kickoff Video, Braga trained

5    Paradise and other founding members on how to present the Trade Coin Club slide deck and

6    most effectively describe Trade Coin Club to solicit new investors.

7        31.    Braga and Paradise promoted Trade Coin Club widely, and a number of their

8    speeches and presentations were recorded and posted online.  Their speeches and presentations

9    highlighted many of the same features of the purported crypto asset trading software that Braga

10   described in his Kickoff Video and in the Trade Coin Club slide deck, including that Trade Coin

11   Club had developed crypto asset trading software that made millions of microtransactions every

12   second and had a stop loss feature that assured minimum daily profits.

13       32.    Numerous recordings feature Paradise explaining Trade Coin Club in depth from

14   the earliest weeks of its existence.  In promoting Trade Coin Club, Paradise identified himself as

15   the "Director of the United States" or "head of the United States" for Trade Coin Club.  For

16   example, Paradise made these representations in a recording on January 2, 2017, and in a video

17   posted to YouTube on January 21, 2017.

18       33.    In its earliest weeks, Paradise identified Braga as the head of Trade Coin Club.

19   For example, in a recording from December 24, 2016, Paradise stated that there was no one

20   "above" Braga in Trade Coin Club.

21       34.    In marketing Trade Coin Club, Paradise touted the advantages of Trade Coin

22   Club's purported trading software.  For example:

23           In a video posted on January 21, 2017, Paradise stated "[B]y using
             our sophisticated technology and the tools that we've designed
24           through the strategies that we've found, and basically we've taken
             about six years of data and we have used that to study, and our
25           system, and our computers have analyzed and analyzed the data and
             to see where the algorithms are and to see -- and it really breaks
26           down to being very simple, you buy low and you sell high, and it's
             that simple. You buy the -- you buy an investment low and then you
27           turn around and sell it high."

28

Securities and Exchange Commission
44 Montgomery Street, Suite 2800
San Francisco, California 94104
(415) 705-2500

In a recording from December 22, 2016, Paradise stated "Okay. So, you have to understand that this software took a lot of time, a lot of money, a lot of effort on riding [sic] for it to work, and some of you might ask, well, what's the track record. Well, we've been on for the last -- since the fifteenth, and we've made money every day. How much money? Sometimes it's $6, $8, $10, you know, it varies depending on the amount of bitcoin you have in of course and what your return is on that. So, for me to put out numbers would be wrong, but for me to tell you that we have actually done (inaudible.) You bet we've made money every day."

In a video posted on February 27, 2017, Paradise stated "Our trading software -- and this is something that I love, because it's very unique. It is -- it is one of a kind. We spent years of developing this software. There's actually only 10 people in the entire United States that know how to program this type of software. It is very unique and encrypted."

35. Paradise frequently stated in promotional presentations that Trade Coin Club guaranteed minimum daily returns. In early conference call recordings that were posted online, Paradise stated that the minimum returns started at .035 or .0035 percent, but in later videos when he presented the Trade Coin Club slide deck, he used the numbers reflected there, beginning at 0.35%. Specifically:

In a recording from December 20, 2016, Paradise stated: "The worst that can happen is that you can make money at .035 percent."

In a recording from December 22, 2016, Paradise stated: "the worst you can do at the low-risk trading level is 0.035 -- 0.0035 percent. That's the worst you'll do, so that's not a negative; that's a positive. So in other words, you're going to make – or you're going to get 0.0035 percent if we have a horrible day, and we can do that because we take 45 percent of our money that's coming into the company, the money that's made and we back those trades."

In a recording from December 24, 2016, Paradise stated: "So, the worst you can do if you have 1 coin in, the worst you're going to do in a day is 0.0035 as a low risk one coin."

In a recording from January 2, 2017, Paradise stated: "If you come in at low the worst you'll do – now catch this very closely, the worst that you will do is 0.0034 percent. If you come in at medium risk, the worst you'll do is 0.004 percent. And if you come in at high risk, the worst you'll do is 0.0045 percent."

In a video posted on January 21, 2017, Paradise stated: "So, guys, it means that risk level at a low level, and that means that the least that

you're going to do at low risk is 0.35 percent.  Now keep in mind that's not brackets.  That's means that we're going to pay you or you're going to make off of your Bitcoin at least 0.35 percent at low risk.  At medium risk it's .40 percent, and at high risk it's .45 percent.  So every day -- if we had a bad day in the trading, you wouldn't have a bad day, you would only make .45 percent, ... .  It's not a lot, but it sure beats a negative or you actually losing money."

In a video posted on February 27, 2017, Paradise stated: "So, then does that mean the worst I'll do on that day if I'm at a low risk is 0.35 percent?  Exactly.  That's exactly what it means.  If you're at a medium risk, the worst you'll do is 0.40 percent, and if you're at a high risk, the worst you'll have in trading day -- if we have a really bad trading day, which we haven't so far, but if we do, the worst you're going to do is 0.45 percent."

36.     Paradise marketed Trade Coin Club as a passive investment that was well suited for individuals with limited funds and without any experience in trading.  In a recording from December 20, 2016, Paradise stated "[s]o what we've done is taken a guy that doesn't know anything about trading, the mom that has three kids that's on social security or on welfare and she has a little bit of – she has some bitcoin and maybe somebody gave her ... we've figured out how to let her do that and be able to make money every day and not lose a dime."

37.     In several recordings, Paradise falsely stated that Trade Coin Club was "licensed" and "insured."

38.     Braga organized an event for Trade Coin Club promoters from around the world to visit Belize, from January 26-30, 2017.  In the months that followed, numerous events promoting Trade Coin Club were held worldwide.  Braga and Paradise presented at most of these events and were featured on the promotional announcements.  Braga approved and paid for expenses associated with many Trade Coin Club events.

### Trade Coin Club Used a Multi-Level Marketing Structure to Recruit New Investors

39.     In their speeches and presentations, Braga and Paradise also touted the opportunity to earn lucrative commissions for recruiting new investors.  They held numerous videoconferences and webinars, including the videos and recordings identified above, in which they trained individuals with experience promoting multi-level marketing operations on how to recruit investors to Trade Coin Club.  For example, in the Kickoff Video, Braga stated, "When

1    you talk to someone who is an investor who does not have the gift of recruiting people … , you

2    do not talk about the other four bonuses.  You only talk about the first one.  Only the direct

3    referral."  In a video posted to YouTube on January 21, 2017, Paradise stated that even though

4    some people may initially "get in this as a passive investor" and not plan to make referrals, when

5    they "see it make them that money back right, quick and then they see this compensation plan

6    and they're like, uhm, you know what, I think I do have somebody that I'd like to get into this."

7         40.    Trade Coin Club offered three levels of membership titled "Apprentice,"

8    "Trader," and "Senior Trader," which provided progressively higher compensation and benefits

9    depending on the amount of initial investment.  The benefits included, among other things,

10   varying levels of commissions for recruiting new members and varying levels of purported

11   minimum investment returns, which were marketed under the guise of the "stop loss" feature.

12        41.    Trade Coin Club provided five categories of commissions for members who

13   brought in new investments, which was referred to as the "compensation plan."  Trade Coin

14   Club offered 10% commissions for direct recruits, additional commissions of 3% to 1% for

15   indirect (or "downstream") recruits up to eight levels, and two different types of periodic

16   bonuses based on the size of the member's whole network.  The fifth level of the compensation

17   plan was called the "Renewal Team Bonus."

18        42.    In addition to the compensation plan, Braga announced a promotion for the first

19   500 people to invest at least 5 bitcoin, which was the minimum to qualify for the Senior Trader

20   level.  Braga stated that this group of 500 people would be considered "founders" and would

21   share 2% of Trade Coin Club's revenues every three months for 10 years.

22        ***Trade Coin Club Grew Rapidly and Then Collapsed***

23        43.    From December 2016 to May 2018, Trade Coin Club collected a total of 82,648

24   bitcoin worth approximately $295 million at the time the bitcoin was received.  Trade Coin Club

25   had over 100,000 investors worldwide, including at least 2,500 investors in the United States.

26        44.    Trade Coin Club investor deposits peaked in June 2017, and investor withdrawals

27   started to exceed deposits by September 2017.  On a monthly basis, the total deposits into Trade

28   Coin Club less withdrawals exceeded 3,000 bitcoin from January through June 2017, and

reached a high in June 2017 of 7,524 bitcoin, worth $19,367,099 at the time.  However, in July 2017, net deposits dropped below 2,000 bitcoin and by September 2017, Trade Coin Club was paying out more in withdrawals than it was bringing in from investors.

45.     In November 2017, Trade Coin Club introduced its own crypto asset named TCoin.

46.     In or around January 2018, Trade Coin Club announced that it was withdrawing from the United States and closing U.S. residents' accounts.  Investors received a notice in the Back Office titled "WE HAVE THE REGRET TO ANNOUNCE THAT WE WILL NO LONGER BE ACCEPTING U.S. INDIVIDUALS."  The notice explained that Trade Coin Club "will be discontinuing services to our existing U.S. individual members and block access to [the] members located in the U.S."  The notice specified that "[c]ustomers who have already recovered their investment or who are winning will have their accounts closed with immediate effect," while anyone "[w]ho has not recovered his investment from now on will have his account partially operative, but he may have activity until he recovers his initial investment and then proceed to withdraw it."

47.     In February 2018, Trade Coin Club announced that it would no longer pay withdrawals in bitcoin but would require investors to withdraw funds in TCoin instead. Investors received another notice in the Back Office that explained "the club decided to exclusively use TCoin TCN as form of payment in order to have faster response to its members, taking into account Blockchain delays."

48.     Braga and Paradise continued promoting Trade Coin Club and the conversion of investors' bitcoin to TCoin into the spring of 2018.  They appeared in a video together that was posted to YouTube on March 27, 2018, in which Paradise stated "keep in mind that TCoin is going to continue to go up, we believe" to which Braga responded "Yeah."  Paradise also appeared in a video with another U.S. promoter that was posted to YouTube on March 5, 2018, in which Paradise encouraged investors to hold on to their TCoin to increase its value.

49.     At an event in Dubai, on May 25-26, 2018, Braga announced that he would be stepping down from Trade Coin Club.  Subsequently, many investors could no longer access

COMPLAINT
*SEC V. BRAGA ET AL.* (NO. 2:22-CV-01563)

12

**Securities and Exchange Commission**
44 Montgomery Street, Suite 2800
San Francisco, California 94104
(415) 705-2500

1  their Trade Coin Club Back Office accounts or withdraw any bitcoin or TCoin.  On July 11,

2  2018, Paradise announced his resignation from Trade Coin Club.

3       50.    Many Trade Coin Club investors were unable to withdraw their crypto assets

4  before Trade Coin Club collapsed and lost most or all of the principal they invested.

5              ***Blockchain Analysis Confirms That Trade Coin Club Operated as a Ponzi Scheme***

6       51.    Blockchain analysis confirms that Trade Coin Club operated consistent with a

7  Ponzi scheme.  Specifically, 99.96% of investors' bitcoin withdrawals were funded by other

8  investor deposits.  This evidence confirms that Trade Coin Club did not earn returns from any

9  crypto asset trading, let alone a trading "bot" that could guarantee daily trading profits.

10      52.    Trade Coin Club maintained custody of the bitcoin directly and processed

11 transactions directly on the Bitcoin blockchain.  At least 8,437 bitcoin of Trade Coin Club's

12 investor deposits were ultimately sent to crypto asset platform accounts in Braga's name.  The

13 Trade Coin Club investments that Braga personally received were worth over $55 million at the

14 time of transfer, which continued even after Trade Coin Club stopped allowing investors to

15 withdraw assets in bitcoin.

16      53.    Throughout Trade Coin Club's period of operations, potential investors raised

17 concerns that it may be a Ponzi scheme.  Braga and Paradise were aware of these concerns and

18 took steps to stop individuals from raising similar concerns, including in the online chat rooms

19 and social media channels related to Trade Coin Club.  For example, in response to a post on

20 September 19, 2017 claiming that TCC was a scam, Paradise separately messaged another

21 promoter: "Dude can you please get that group under control???" and "Get that person out of

22 that group please."

23      54.    Braga attempted to remove negative information from the internet concerning

24 Trade Coin Club and his involvement.  In late 2017, Braga hired a search engine optimization

25 specialist to minimize negative reviews concerning Trade Coin Club and its associates, including

26 to improve Braga's reputation online.  Braga also filed a lawsuit against Google in Brazil

27 seeking to remove online content accusing Braga of perpetrating a Ponzi scheme through Trade

28 Coin Club.

*Paradise and Taylor Earned Lucrative Commissions for Soliciting and Securing New Investments in Trade Coin Club*

55.     Taylor paid 5.05 bitcoin for the Senior Trader package on or around December 19, 2016, following a call during which Paradise explained the program.  Beginning on or around December 26, 2016, Taylor published instructional videos that she narrated showing viewers how to navigate Trade Coin Club's website and Back Office through screen recordings. Taylor circulated these videos, the English version of the Trade Coin Club slide deck, and her registration link to people in her network, including by email.  Investors were required to use a registration link from another member in order to access the Trade Coin Club website and make an investment.

56.     Initially, Taylor shared her Trade Coin Club account with a partner, but the partner ended his involvement with and promotion of Trade Coin Club in February 2017.  Taylor received the commissions and other compensation that were provided through her Trade Coin Club account.

57.     Taylor promoted Trade Coin Club widely online and at in-person events, including in Washington State.  Taylor posted frequently on social media, using the title "Team Mega" to refer to her Trade Coin Club network.

58.     On June 27, 2017, Taylor held a promotional event in Utah, describing herself as a "single mom that earned 1000 bitcoins from 5 [b]itcoin in less than 7 months."

59.     On July 22, 2017, Taylor held an event at her residence in Sammamish, Washington.  Paradise was featured as a "VIP Special Guest" and made a presentation explaining Trade Coin Club at this event.

60.     Taylor also traveled abroad in connection with her work recruiting investors for Trade Coin Club, including to Africa in April 2017, Macau in May 2017, Belize in July 2017, Thailand in November 2017, and Dubai in May 2018.

61.     Both Taylor and Paradise emphasized the importance of recruiting new members to their network in order to be successful within Trade Coin Club.  Taylor regularly distributed to her network updates regarding Trade Coin Club.  She also escalated account-related support

COMPLAINT
*SEC V. BRAGA ET AL.* (NO. 2:22-CV-01563)
14
Securities and Exchange Commission
44 Montgomery Street, Suite 2800
San Francisco, California 94104
(415) 705-2500

issues raised by investors in her network to Paradise, who regularly addressed them on behalf of Trade Coin Club.

62. Paradise directly sponsored at least 24 Trade Coin Club members who invested a total of 48.38 bitcoin worth $136,336 at the time. From February 22, 2017 through February 8, 2018, Trade Coin Club paid Paradise at least 238.97 bitcoin worth $1,410,164 at the time he received it. These funds compensated Paradise for the investors he recruited into Trade Coin Club, including pursuant to the "compensation plan" described above.

63. Taylor's account directly sponsored at least 107 Trade Coin Club members who invested a total of 185.55 bitcoin worth $523,103 at the time. At least seven of those investors identified their residence as being within the Western District of Washington.

64. Before, during, and after her time promoting Trade Coin Club, Taylor also earned commissions for referring people to other investments.

65. On September 28, 2017, Taylor posted on a social media group chat she moderated that Trade Coin Club Team Mega had crossed 32,000 members. From February 7, 2017 through January 27, 2018, Trade Coin Club paid Taylor at least 735.54 bitcoin worth $2,647,413 at the time she received it. These funds compensated Taylor for the investors she recruited into Trade Coin Club, including pursuant to the "compensation plan" described above.

***The Trade Coin Club Membership Interests Were Offered and Sold as Investment Contracts, and Therefore Securities, Under the Federal Securities Laws***

66. The membership interests in Trade Coin Club that Defendants offered and sold during the offering from at least December 2016 to May 2018 constituted "securities" under the federal securities laws. The definition of "security" includes a range of investment vehicles, including "investment contracts." Investment contracts are instruments involving the investment of money in a common enterprise with the reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others.

67. Investors in the Trade Coin Club offering reasonably viewed the offering as an opportunity to profit from Defendants' use of the purported crypto asset trading software that was described in the Trade Coin Club slide deck and other promotional materials and touted by

COMPLAINT
*SEC V. BRAGA ET AL.* (NO. 2:22-CV-01563)

15

Securities and Exchange Commission
44 Montgomery Street, Suite 2800
San Francisco, California 94104
(415) 705-2500

1  Braga and Paradise in speeches and presentations.  The potential success of the investments

2  depended on the success of Trade Coin Club's operations, namely trading crypto assets.

3      68.    Braga and Paradise knew, or were reckless in not knowing, that their statements

4  about Trade Coin Club's purported automated trading software were materially false and

5  misleading.  Braga and Paradise further knew, or were reckless in not knowing, that they were

6  operating a scheme to defraud investors in the Trade Coin Club securities.

7  **TOLLING AGREEMENT**

8      69.    On January 29, 2022, Defendant Taylor and her counsel signed a tolling

9  agreement with the Commission.  The tolling agreement specifies a period of time (a "tolling

10  period") in which the "running of any statute of limitations applicable to any action or

11  proceeding against [the defendant] authorized, instituted, or brought by or on behalf of the

12  Commission or to which the Commission is a party arising out of the investigation ('any

13  proceeding'), including any sanctions or relief that may be imposed therein, is tolled and

14  suspended for the period beginning on January 28, 2022 through July 28, 2022 …."  The tolling

15  agreement further provides that Taylor and any of her agents or attorneys "shall not include the

16  tolling period in the calculation of any running of the statute of limitations or for any other time-

17  related defense applicable to any proceeding, including any sanctions or relief that may be

18  imposed therein, in asserting or relying upon any such time-related defense."

19  **FIRST CLAIM FOR RELIEF**

20  **Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder**

21  **By Defendants Braga and Paradise**

22      70.    The SEC re-alleges and incorporates by reference paragraph numbers 1 through

23  69.

24      71.    By engaging in the conduct described above, Defendants Braga and Paradise, in

25  connection with the purchase or sale of securities, directly or indirectly, by the use of the means

26  or instrumentalities of interstate commerce, or of the mails, or of the facilities of a national

27  securities exchange, with scienter:

28          (a)    employed devices, schemes, or artifices to defraud;

COMPLAINT
*SEC V. BRAGA ET AL.* (NO. 2:22-CV-01563)
16
**Securities and Exchange Commission**
44 Montgomery Street, Suite 2800
San Francisco, California 94104
(415) 705-2500

1        (b)    made untrue statements of material fact or omitted to state material facts

2               necessary in order to make the statements made, in the light of the

3               circumstances under which they were made, not misleading; and

4        (c)    engaged in acts, practices, or courses of business which operated or would

5               operate as a fraud or deceit upon other persons, including purchasers and

6               sellers of securities.

7      72.    By reason of the foregoing, Defendants Braga and Paradise each violated, and

8  unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act [15

9  U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

10                             **SECOND CLAIM FOR RELIEF**

11           **Violations of Sections 17(a)(1), (2), and (3) of the Securities Act**

12                    **By Defendants Braga and Paradise**

13      73.    The SEC re-alleges and incorporates by reference paragraph numbers 1 through

14  69.

15      74.    By engaging in the conduct described above, Defendants Braga and Paradise,

16  directly or indirectly, in the offer or sale of securities, by use of the means or instruments of

17  transportation or communication in interstate commerce or by use of the mails:

18        (1)    with scienter, employed devices, schemes, or artifices to defraud;

19        (2)    obtained money or property by means of untrue statements of material fact

20               or by omitting to state a material fact necessary in order to make the

21               statements made, in light of the circumstances under which they were

22               made, not misleading; and

23        (3)    engaged in transactions, practices, or courses of business which operated

24               or would operate as a fraud or deceit upon purchasers.

25      75.    By reason of the foregoing, Defendants Braga and Paradise each violated, and

26  unless restrained and enjoined will continue to violate, Section 17(a) of the Securities Act

27  [15 U.S.C. § 77q(a)].

28

## THIRD CLAIM FOR RELIEF

### Violations of Sections 5(a) and 5(c) of the Securities Act

### By Defendants Braga, Paradise, and Taylor

76.     The SEC re-alleges and incorporates by reference paragraph numbers 1 through 69.

77.     By reason of the foregoing, (a) without a registration statement in effect as to that security, Defendants, directly and indirectly, made use of the means and instruments of transportation or communications in interstate commerce and of the mails to sell securities through the use of means of a prospectus, and (b) made use of the means and instruments of transportation or communication in interstate commerce and of the mails to offer to sell through the use of a prospectus, securities as to which no registration statement had been filed.

78.     By reason of the foregoing, Defendants Braga, Paradise, and Taylor each directly or indirectly violated, and unless restrained and enjoined will continue to violate, Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and (c)].

## FOURTH CLAIM FOR RELIEF

### Violations of Section 15(a) of the Exchange Act

### By Defendants Paradise and Taylor

79.     The SEC re-alleges and incorporates by reference paragraph numbers 1 through 69.

80.     By engaging in the conduct described above, Defendants Paradise and Taylor, directly or indirectly, through use of the means or instruments of transportation or communication in interstate commerce or the mails, acted as a broker and/or effected transactions in, and induced or attempted to induce the purchase or sale of, securities (other than an exempted security or commercial paper, bankers' acceptances or commercial bills) without being registered with the Commission in accordance with Section 15(b) of the Exchange Act [15 U.S.C. § 78o(b)].

81.     By reason of the foregoing, Defendants Paradise and Taylor each violated, and unless restrained and enjoined will continue to violate, Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)].

## **PRAYER FOR RELIEF**

WHEREFORE, the SEC respectfully requests that this Court:

I.

Permanently restrain and enjoin Defendant Braga from, directly or indirectly, violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)]; and Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and (c)].

II.

Permanently restrain and enjoin Defendant Paradise from, directly or indirectly, violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)]; Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and (c)]; and Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)].

III.

Permanently restrain and enjoin Defendant Taylor from, directly or indirectly, violating Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and (c)] and Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)].

IV.

Permanently restrain and enjoin the Defendants from directly or indirectly (1) offering, operating, or participating in any marketing or sales program in which the participant is compensated or promised compensation solely or primarily for (a) inducing another person to become a participant in the program; or (b) if such induced person induces another to become a participant in the program; and (2) participating directly or indirectly in any offering of crypto

1   asset securities; provided, however, that such injunction shall not prevent each of them from

2   purchasing or selling crypto asset securities for their own personal accounts.

3                                                    V.

4          Order the Defendants to disgorge all ill-gotten gains they received directly or indirectly,

5   with prejudgment interest thereon, as a result of the alleged violations, pursuant to Section

6   21(d)(3), (5), and (7) of the Exchange Act [15 U.S.C. §§ 78u(d)(3), (5), and (7)].

7                                                    VI.

8          Order the Defendants to pay civil monetary penalties pursuant to Section 20(d) of the

9   Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. §

10  78u(d)(3)].

11                                                   VII.

12         Retain jurisdiction of this action in accordance with the principles of equity and the

13  Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and

14  decrees that may be entered, or to entertain any suitable application or motion for additional

15  relief within the jurisdiction of this Court.

16                                                   VIII.

17         Grant such other and further relief as this Court may deem just, equitable, and necessary.

18

19  Dated:  November 3, 2022

20                                                          Respectfully submitted,

21                                                           s/ Serafima Krikunova McTique
                                                            Serafima Krikunova McTigue
22                                                          (Conditionally Admitted Pursuant to LCR
                                                            83.1(c)(2))
23                                                          Securities and Exchange Commission
24                                                          44 Montgomery Street, Suite 2800
                                                            San Francisco, California  94104
25                                                          Telephone:  (415) 705-2500
                                                            Facsimile:  (415) 705-2501
26                                                          Email:  mctigues@sec.gov
                                                            *Attorney for Plaintiff Securities and*
27                                                          *Exchange Commission*

28